**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **RAY NUNLEY,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | **Civil Action No. 7:04-CV-0203-BH(R)** |
| **v.** | § | |
| | § | |
| **COMMISSIONER OF SOCIAL SECURITY,** | § | |
| | § | |
| **Defendant.** | § | **Consent Case** |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the provisions of Title 28, United States Code, Section 636(c), and an *Order* of the Court in implementation thereof, subject cause has been transferred to the undersigned United States Magistrate Judge. Before the Court are *Brief for Plaintiff*, filed March 7, 2005, and *Defendant's Response to Plaintiff's Brief*, filed June 1, 2005. Having reviewed the evidence of the parties in connection with the pleadings, the undersigned finds that the decision of the Commissioner should be **AFFIRMED**.

## I. BACKGROUND[2]

### *A. Procedural History*

Ray Nunley ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying his claim for disability benefits under Title XVI of the Social Security Act. On July 23, 2002, Plaintiff filed an application for disability benefits. (Tr. at 93-95.) Plaintiff claimed he was disabled due to mental retardation. (Tr. at 113.) Plaintiff's

[2] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

application was denied initially and upon reconsideration. (Tr. at 55-60; 63-65.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 66.) A hearing, at which Plaintiff personally appeared and testified, was held on November 25, 2003. (Tr. at 27-49). On February 19, 2004, an ALJ issued his decision finding Plaintiff not disabled. (Tr. at 16-26.) The Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision. (Tr. at 6-12.) Thus, the ALJ's decision became the final decision of the Commissioner. (Tr. at 6.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on November 12, 2004.

***B. Factual History***

**1. Age, Education, and Work Experience**

Plaintiff was born on September 30, 1975, and at the time of the hearing, he was 28 years old. (Tr. at 35.) He completed ninth grade, taking special education classes. (Tr. at 35, 38.) Plaintiff had no past relevant work experience. (Tr. at 24, 45.)

**2. Medical Evidence**

On June 27, 1979, when Plaintiff was three years old, he was examined by Mary K. Savage, an educational diagnostician. (Tr. at 194-95.) Plaintiff's intellectual functioning was more than two standard deviations below the mean for his age group. (Tr. at 194.) Plaintiff's IQ was found to be 60, within retardation range. *Id.* Ms. Savage opined that Plaintiff met the Texas Education Agency's criteria for mental retardation and would benefit from placement in an early childhood class. (Tr. at 195.)

On July 28, 1981, when Plaintiff was five years old, he was examined by Phillip C. McGraw, Ph. D. (Tr. at 205-06.) Due to Plaintiff's poor attention span, certain tests were unable to be administered. (Tr. at 205.) Plaintiff's IQ was found to be 55, within the very slow learners/mental defective range. *Id.* Plaintiff exhibited a very high energy level. (Tr. at 206.)

In December 1982, Plaintiff was assessed by a school district team to reappraise his need for special education services. (Tr. at 174-76.) The assessment noted that IQ testing was fourteen points higher than the test conducted on June 27, 1979, and that Plaintiff tested within the borderline range of intellectual functioning. (Tr. at 175.) Plaintiff was found to meet the criteria for learning disability. (Tr. at 176.)

On May 9, 1986, at age seven, Plaintiff was evaluated by Leon Morris, Ed.D. (Tr. at 207-09.) Because Plaintiff's mother insisted he was eight years old, the tests were scored using eight-year-old norms. (Tr. at 207.) Plaintiff was uncooperative during the examination and Dr. Morris felt it was possible that an unrealistically low score was obtained as a result. (Tr. at 208.) Plaintiff's mother reported that he had a temper, but that he did not suffer from behavior problems. *Id.* When his tests were scored on the eight-year-old level, his IQ tested as 41, in the moderate mental retardation range. *Id*. The tests also revealed organic impairment underlying Plaintiff's mental retardation. (Tr. at 209.) When scoring Plaintiff's tests on the seven-year-old level, his IQ tested as 47, also within the moderate mental retardation range. *Id.*

On December 20, 2001, when he was twenty-six years old, Plaintiff was examined by Kenneth Liebenau, Ph.D., a consultative examiner. (Tr. at 210-12.) Plaintiff reported that he had been receiving disability but that it was discontinued due to his incarceration in 1999, for driving with a suspended license. (Tr. at 210.) Plaintiff reported having difficulty reading, spelling, and

performing math. *Id.* He also "alluded to behavioral problems including not listening, and acting defiantly." *Id.* Plaintiff denied any prior psychiatric treatment. *Id.* Plaintiff stated that he avoided people and had no friends. *Id.* Plaintiff was able to take care of his personal needs, but relied on his mother to take care of his finances and fill out paperwork. *Id.* Plaintiff enjoyed working on cars. *Id*. Plaintiff's tests showed a full scale IQ of 65. (Tr. at 211.) Dr. Liebenau found that based on the test results Plaintiff fell within the mild mental retardation range, but that he had higher adaptive functioning skills. *Id.* Additionally, Dr. Liebenau found that Plaintiff had avoidant personality traits and felt that antisocial behavior needed to be ruled out. *Id.* Dr. Liebenau concluded that Plaintiff probably qualified for a diagnosis of "Mild Mental Retardation with Possible Learning Deficiencies and Personality Traits including Avoidant and Possible Antisocial Ones." *Id.* He noted that Plaintiff "was able to understand and carry out simple instructions but at times did not comprehend the instructions. His attention and concentration was fair." (Tr. at 211-12.) Due to Plaintiff's limited work history, Dr. Liebenau felt that Plaintiff might benefit from vocational assessment and training. (Tr. at 212.)

Plaintiff was examined by Dr. Morris again on September 17, 2002. (Tr. at 237-241.) Although Plaintiff was twenty-six years old at the time, he insisted he was twenty-seven. (Tr. at 237.) Dr. Morris noted multiple inconsistencies between Plaintiff's previous statements to Dr. Liebenau and the statements made to Dr. Morris. *Id.* Additionally, Plaintiff stated that he had never had a driver's license, but also stated that he was jailed for driving with a suspended license. (Tr. at 238.) Plaintiff denied any prior mental health treatment and any symptoms of mental disorder. *Id.* He worked on cars as a hobby and did not have friends or date. (Tr. at 239.) Plaintiff's memory and concentration were fair, his abstract reasoning ability was concrete, and his funds of general

information and vocabulary were poor. (Tr. at 239-40.) Plaintiff's intelligence was estimated to be within the mild retardation range, but his adaptive functioning suggested higher potential. (Tr. at 240.) Dr. Morris felt that Plaintiff's "ability to do work-related mental activities, such as his ability to understand, remember, sustain concentration, persist, socially interact, and adapt" was adequate for many kinds of work. *Id.* Dr. Morris diagnosed mild mental retardation and a non-specified personality disorder. *Id.* Plaintiff's Global Assessment of Functioning ("GAF") was 60. (Tr. at 241.) Dr. Morris completed a "Mental Residual Functional Capacity Assessment" wherein he found Plaintiff's ability to understand, remember, and carry out detailed instructions, and his ability to interact appropriately with the public to be markedly limited. (Tr. at 242-43.) In explaining his findings, Dr. Morris stated, "Claimant can remember, understand and carry out simple instructions. He can relate on a superficial basis for work purposes only." (Tr. at 244.)

**3. <u>Hearing Testimony</u>**

On November 25, 2003, the ALJ held a hearing at which Plaintiff appeared personally. (Tr. at 264-79.) Plaintiff was not represented at the hearing. (Tr. at 264.) Plaintiff's mother attended the hearing and provided testimony. *Id.* Plaintiff testified that he was 28 years old and had completed ninth grade in special education classes. (Tr. at 268, 271.) He could read and write a little. *Id.* Plaintiff testified that he had performed landscaping and painting work in the past through a temporary employment agency. (Tr. at 269.)

Plaintiff's mother testified that Plaintiff had difficulty getting along with others because he said things which hurt people's feelings. (Tr. at 273.) She stated that when he worked on a job "he kind of like bosses them around so they don't let him stay on a job that long like that." *Id.* She stated that Plaintiff was able to care for himself but that she took care of his financial matters. (Tr.

at 274.) Plaintiff's mother testified that Plaintiff enjoyed working on cars and that he could fix cars "pretty good." (Tr. at 275-76.)

A vocational expert ("VE") testified and stated that Plaintiff had essentially no vocational history. (Tr. at 276.) The VE was asked to consider a hypothetical individual with Plaintiff's age, education, and work experience who was

> markedly limited in the ability to understand and remember detailed instructions and in the ability to carry out detailed instructions. He is also markedly limited in the ability to interact appropriately with the public. And he has moderate limitations that is [sic] less than marked in the ability to respond appropriately to changes in the work like setting. So obviously he certainly would be limited to simple repetitive unskilled work.

(Tr. at 276-77.) The VE concluded that an individual with those limitations would be able to perform simple repetitive unskilled work in jobs such as a racker and silver wrapper. (Tr. at 277-78.) The VE stated that of the total base of unskilled work, only ten percent would remain for an individual with Plaintiff's residual functional capacity. (Tr. at 278.)

### *C. ALJ's Findings*

The ALJ denied Plaintiff's application for benefits by written opinion issued on February 19, 2004. (Tr. at 19-26.) The ALJ found that Plaintiff had never engaged in substantial gainful activity. (Tr. at 20.) The ALJ determined that Plaintiff's mental retardation constituted a severe impairment. (Tr. at 21.) However, Plaintiff's personality disorder was found to be not severe. *Id*. The ALJ found that Plaintiff's impairments did not meet or equal the severity of any impairment in the Listings. (Tr. at 21-22.)

The ALJ found Plaintiff's statements concerning his functional limitations to be partially credible but not to the extent that they indicated limitations so severe that they precluded work activity. (Tr. at 22.) In particular, the ALJ noted that Plaintiff's medical history showed that

Plaintiff was able to generally function well and that his daily activities were not indicative of severe limitations. (Tr. at 22-23.)

In setting forth Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff had no exertional limitations but that he was "markedly limited in the ability to understand, remember, and carry out detailed instructions; and interact appropriately with the general public. In addition the claimant is moderately limited in the ability to respond appropriately to changes in a work setting." (Tr. at 23.) The ALJ relied upon the testimony of the VE in concluding that Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy. (Tr. at 24-25.) As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. at 25.)

## II. ANALYSIS

### *A. Legal Standards*

#### 1. <u>Standard of Review</u>

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding

of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

**2. Disability Determination**

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be

disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

***B. Issues for Review***

Plaintiff presents the following issues for review:

(1) The ALJ erred in finding that Plaintiff did not have a combination of impairments which met or equaled Listing 12.05C; and

(2) The ALJ erred in concluding that there were jobs available in significant numbers in the national economy that Plaintiff was capable of performing.

### *C. Issue One: Listing 12.05C*

Plaintiff asserts that the ALJ erred at step two of his analysis by finding that Plaintiff's impairments did not meet or equal a listed impairment because his impairments meet the requirements of Listing 12.05C. (Pl.'s Br. at 14.)

Pursuant to the listing for mental retardation:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.05. In explaining how this section is to be applied, the regulations state:

> For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c) and 416.920(c). If the additional impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Sec. 12.00A. Social Security Ruling 96-3p provides in part that:

> At step 2 of the sequential evaluation process, an impairment or combination of impairments is considered "severe" if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is "not severe" must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities. . . . A determination that an individual's impairment(s) is not severe requires a careful

> evaluation of the medical findings that describe the impairment(s) (i.e., the objective medical evidence and any impairment-related symptoms), and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities.

SSR 96-3p. "An impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985). A diagnosis alone is not a sufficient basis for a finding that an impairment is severe. *Sellers v. Barnhart*, 246 F. Supp. 2d 1201, 1211 (M.D. Ala. 2002). "The severity of a medically ascertained impairment must be measured in terms of its effect upon ability to work and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *Id.* (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)). "Objective medical evidence must confirm that the impairment is severe." *Id.* (citing SSR 96-3p).

In this case, the ALJ's decision evidences a thorough review of the medical evidence, noting Dr. Morris's diagnostic impression that Plaintiff had an unspecified personality disorder and the testimony of Plaintiff's mother regarding his difficulties in getting along with others. (Tr. at 20-21.) Although the ALJ did not specifically detail the reasons for his determination that Plaintiff's personality disorder was not severe, considering the relevant evidentiary facts and applicable standards, substantial evidence supports the ALJ's conclusion. Nothing in the record indicates Plaintiff's personality disorder was more than a slight abnormality with more than a minimal effect on his ability to perform basic work activities. Plaintiff never sought or received mental health treatment for this disorder. Additionally, Dr. Morris, who was the only physician to diagnose a personality disorder, opined that Plaintiff's ability to socially interact appeared "adequate for many kinds of work." (Tr. at 240.)

Plaintiff contends that the ALJ's conclusion at step two that his personality disorder was not a severe limitation is inconsistent with the ALJ's RFC finding that Plaintiff was markedly limited in the ability to interact appropriately with the public. (Pl.'s Br. at 16.) The fact that the ALJ found Plaintiff to be markedly limited in the ability to interact appropriately with the public does not change the outcome of the Court's analysis, however. That finding was made at step four of the ALJ's analysis when the ALJ was considering the effects of all of Plaintiff's limitations on his RFC. The ALJ did not specify how much of that finding was due to Plaintiff's mental retardation and how much was due to his personality disorder, and he was not required to do so.

Plaintiff did not meet his burden to show that his personality disorder was severe in that it was more than a slight abnormality with more than a minimal effect on his ability to perform basic work activities. Accordingly, the Court finds that substantial evidence supports the ALJ's determination at step two that Plaintiff's personality disorder was not severe.

### *D. Issue Two: Jobs in Significant Numbers*

Plaintiff next contends that the ALJ erred in concluding that there were jobs available in significant numbers in the national economy that Plaintiff was capable of performing. (Pl.'s Br. at 18-20.) In particular, Plaintiff asserts that the VE testified that with the limitations recognized by the ALJ, 100 percent of the unskilled job base would be eliminated. *Id.* at 20.

During his testimony, the VE opined that Plaintiff was able to perform simple, repetitive, unskilled work with no relating to the general public. (Tr. at 277.) The VE identified two such jobs, that of racker, and silver wrapper. (Tr. at 277-78.) Subsequently, the following exchange between the ALJ and the VE took place:

> ALJ: As a percentage of the total base of unskilled work how much would remain with these limitations? Can you tell me that?

VE: The no work with the public would eliminate about 10 to 15%.

ALJ: So 85 to 95 %.

VE: Only being able to perform repetitive or short . . . work was would eliminate approximately 90 % so I would say as a whole then just with repetitive or short cycle work that would eliminate 90 % of the job base.

ALJ: Eliminate 90 % of the unskilled job base?

VE: Correct. Is that what you're looking for?

ALJ: That number?

VE: Yeah.

ALJ: Well I really wasn't looking for a number. I just needed to have an estimate of how much would remain, so about 10 % of the unskilled job base would remain with this RFC?

VE: Correct.

(Tr. at 278.) In his brief, Plaintiff states:

> In other words, the VE appeared to be stating that one limitation posed by the ALJ . . . would, alone, eliminate 10-15% of the unskilled job base, and that another limitation also posed by the ALJ . . . would , alone, eliminate approximately 90 % of the unskilled job base. Although the VE's testimony is not totally clear, this would seem to mean that the combination of these two limitations would eliminate 100% of the unskilled job base, even allowing for a 5% overlap. This is obviously inconsistent with the VE's earlier testimony as to the jobs of "racker" and "silver wrapper. . . ."

(Pl.'s Br. at 20.) However, any lack of clarity was resolved by the ALJ's follow-up question. The VE clearly agreed that ten percent of the unskilled job base would remain for an individual with Plaintiff's RFC. (Tr. at 278.) This is not inconsistent with the VE's opinion that an individual such as Plaintiff could perform the jobs of racker and silver wrapper as they are generally performed in the national economy. Accordingly, the Court finds that the ALJ did not err in relying on the VE's testimony and that substantial evidence supports the ALJ's conclusion that there existed jobs in the

national economy which Plaintiff was capable of performing.

## III. CONCLUSION

For the foregoing reasons, the final decision of the Commissioner is **AFFIRMED.**

**SO ORDERED**, on this the 15th day of August, 2006.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE